## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

| | |
|---|---|
| CHAD L. CHANDLER, Pro Se, | CV 11-46-M-DWM-JCL |
| Plaintiff, | |
| vs. | FINDINGS &RECOMMENDATION OF UNITED STATES |
| SENTRY SELECT INSURANCE COMPANY, AND JOEL PONEDEL, a claims adjuster for Sentry Ins., Company, a Wisconsin Corporation, | MAGISTRATE JUDGE<br><br>and<br><br>ORDER |
| Defendant. | |

_____

This insurance bad faith case comes before the Court on pro se Plaintiff

Chad Chandler's ("Chandler") motion for partial summary judgment and motion

in limine. For the reasons set forth below, Chandler's motions are properly

denied.

## I.      Background

Chandler began working as a service consultant for Scarff Auto Center, Inc.

("Scarff") in the spring of 2007. Scarff and Chandler agreed to a written pay plan,

which provided that for the first year Chandler was to receive a base salary of

$1,000 per month and a monthly commission equal to 2% of service sales. Dkt.

36-1, at 2. The pay plan contemplated that Chandler's monthly commission would increase to 3% beginning in June 2008. Dkt. 36-1, at 2.

Chandler's employment apparently continued without incident until November 2008, when Scarff withheld a portion of Chandler's monthly commission. Dkt. 36-1, at 3-4. Scarff also reduced the amount of Chandler's commission payments for December 2008 and March 2009. Dkt. 36-1, at 3-4. Citing adverse economic conditions, Scarff advised its employees in October 2009 that there would "be no commission or bonus checks issued monthly...until further notice." Dkt. 36-1, at 10. Scarff withheld Chandler's commission for September 2009 accordingly, and Chandler resigned in mid-October. Dkt. 36-1, at 4.

In December 2009, Chandler filed suit against Scarff in state court, asserting claims denominated as follows: Wage Claim (Count I); Wrongful Discharge from Employment Act, WDEA, Constructive Discharge (Count II); Intentional and Negligent Infliction of Emotional Distress, Deceit (Count III); False Light (Count IV), and; Pierce the Corporate Veil (Count V). Dkt. 36-3. Chandler sought $7,923.20 in unpaid wages and $251,232.00 in lost wages and benefits from his former employer, as well as unspecified compensatory, punitive damages, and attorney fees and costs. Dkt. 36-3, at 24.

At the time, Scarff was insured under a Commercial Garage Policy ("the Policy") issued by Defendant Sentry Select Insurance Company ("Sentry"). Dkt. 46 (Exh. 500). Sentry defended Scarff in the underlying lawsuit, subject to a reservation of rights under the Policy. Dkt. 46 (Exh. 501, at 3). In May 2010, Scarff and Chandler entered into a settlement agreement whereby Sentry paid Chandler $12,000 on Scarff's behalf, and Chandler released his claims against Scarff. Dkt. 46 (Exh. 501, at 166-69). Shortly thereafter, the state court entered an order dismissing Chandler's lawsuit with prejudice based on the settlement. Dkt 46 (Exh. 501, at 170).

In December 2010, Chandler commenced this action in state court against Sentry and claims adjuster Joel Ponedel.[1] Dkt. 3. Sentry later the removed the case to this Court based on diversity jurisdiction. Dkt. 1. Chandler asserts claims for deceit, constructive fraud, unjust enrichment, and violations of Montana's Unfair Trade Practices Act ("UTPA"), M.C.A. §§ 33-18-201 et. seq. Dkt. 17. In particular, Chandler alleges that Sentry misrepresented the terms of the Policy and concealed material facts regarding its use of Accenture software in violation of Mont. Code Ann. § 33-18-201(1). Dkt. 17, ¶¶ 14-20. Chandler also claims that

---

[1] Except where noted, the Court will refer to the Defendants collectively as "Sentry".

Sentry "refused to pay damages for the underlying wage claim in which liability was reasonably clear" and otherwise violated unspecified subsections of Mont. Code Ann. § 33-18-201 when adjusting and settling his underlying claims against Scarff.  Dkt. 17, ¶¶ 35-39.

Chandler has moved for partial summary judgment, asking the Court to hold as a matter of law that the Policy covered his underlying claims against Scarff, and that Sentry misrepresented pertinent facts and insurance policy provisions in violation of Mont. Code Ann. § 33-18-201(1).  Chandler also moves in limine to preclude Sentry from introducing evidence that Scarff has since become insolvent and is no longer doing business in Montana.  The Court will address each of these motions in turn.

## II.    Motion for Partial Summary Judgment

### A.    Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

In general, "pro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler,* 790

F.2d 1362, 1364 (9th Cir. 1986). This means that "[p]ro se litigants must follow the same rules of procedure that govern other litigants." *King v. Atiyeh*, 814 F.2d 565, 576 (9th Cir. 1987). Nevertheless, in the summary judgment context, courts are to construe pro se documents liberally and give pro se litigants the benefit of any doubt. *Erickson v. Pardus* 551 U.S. 89, 94 (2007); *Frost v. Symington*, 197 F.3d 348, 352 (9th Cir. 1999).

## B.    Coverage under the Policy

Chandler invokes three of the Policy's various coverage provisions. First, Chandler takes the position that his claim for lost wages fell within the scope of the Policy's Garage Operations coverage provision. Second, Chandler maintains that the Policy's Employment Practices Endorsement provided coverage for his constructive discharge claim. Finally, Chandler contends that the Policy's Personal and Advertising Injury Liability Coverage provision encompassed his so-called "False Light" claim.

It is well-established in Montana that the interpretation of an insurance contract such as the one at issue here "presents a question of law."[2]  *Moodroo v.*

---

[2] Sitting in diversity jurisdiction, this Court looks to the substantive law of Montana as the forum state for purposes of the ensuing analysis. *See Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

*Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, ¶ 24 (Mont. 2008). The Court must interpret the terms of the "insurance policy according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, ¶ 16 (Mont. 2008) (quoting *Stutzman v. Safeco Ins. Co. of America*, 945 P.2d 32, 34 (Mont. 1997). In doing so, the Court "may not rewrite the contract at issue, but must enforce it as written if its language is clear and explicit." *Allstate Ins. Co.*, at ¶ 16.

If the terms of an insurance policy are ambiguous, however, that ambiguity must be strictly construed against the insurer and in favor of extending coverage. *Stutzman*, 945 P.2d at 34; *Mitchell v. State Farm Ins. Co.*, 68 P.3d 703, 709 (Mont. 2003). "An '[a]mbiguity exists only when the contract taken as a whole or in its wording or phraseology is reasonably subject to two different interpretations.'" *Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, ¶ 25 (Mont. 1998). Regardless of whether they are ambiguous, exclusions from coverage will be narrowly and strictly construed against the insurer "because they are contrary to the fundamental protective purpose of an insurance policy." *Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, ¶ 46 (Mont. 2009). *See also Stutzman*, 945 P.2d at 36. It is well-established in Montana "that it is the acts giving rise to the complaint which form the basis for coverage, not the

complaint's legal theories or conclusory language." *Town of Geraldine v.*

*Montana Mun. Ins. Authority*, 198 P.3d 796, 800 (Mont. 2008).

It is with these principles in mind that the Court considers Chandler's

motion for summary judgment and the terms of the Policy at issue here.

<u>1.    Garage Operations Coverage Provision</u>

The garage operations provision on which Chandler relies as one potential

source of coverage states, in relevant part, as follows:

"Garage Operations" other than Covered "Autos"

We will pay all sums an "insured" legally must pay as damages, including
punitive damages where insurable by law, because of "bodily injury" or
"property damage" to which this insurance applies caused by an "accident"
and resulting from "garage operations" other than the ownership,
maintenance or use of covered "autos".

Dkt. 46 (Exh. 500, at 165).

Chandler argues the wage loss claim he advanced against Scarff in the

underlying action was covered under this provision because it constituted a claim

for "property damage" caused by an "accident" and resulting from "garage

operations."[3]  But Chandler misapprehends both the nature of his claim for lost

─────────────────

[3] Chandler does not argue that any of his other claims against Scarff would have
been covered under this provision, and does not argue that his wage claim alleged
"bodily injury."  Even assuming the underlying complaint could somehow be read
as alleging "bodily injury," it does not allege that Chandler suffered damage as the
result of an "accident," as required by garage operations provision. *See below*, at

wages and the scope of this coverage provision.

The Policy defines "property damage" as "damage to or loss of the use of tangible property." Dkt 46. (Exh. 500, at 196). Chandler maintains that the commission wages he sought to recover from Scarff in the underlying action were tangible property as contemplated by this definition. For support, Chandler relies on *Graber v. State Farm Fire and Cas. Co.*, 797 P.2d 216, 216 (Mont. 1990), in which the Montana Supreme Court described tangible property as "property that is capable of being handled, touched, or physically possessed." Because money is capable of being handled, touched, or physically possessed, Chandler takes the position that his claim for lost wages alleged "property damage" as defined by the Policy.

But *Graber* actually stands for the opposite proposition. At issue in *Graber* was whether economic loss alleged to have resulted from the insured's plagiarism constituted property damage within the meaning of a business insurance policy. *Graber*, 797 P.2d at 216. The policy defined property damage as including the "loss of use of tangible property which has not been injured." *Graber*, 797 P.2d at 216. The *Graber* court held that the purely economic loss alleged in the underlying complaint "did not constitute property damage, or loss of use of

10-11.

tangible property" as defined by the policy. *Graber*, 797 P.2d at 217.

Three judges of this Court were previously called upon to consider whether, under Montana law, lost wages constituted property damage under essentially identical policy definitions. All three judges held they did not, concluding that allegations of lost salary and benefits did not involve tangible property and so fell outside the scope of coverage provided for by the respective policies. *Mutual Service Casualty Ins. Co. Co-Op Supply, Inc. of Dillon, Montana,* 669 F. Supp 1438, 1441-42 (D. Mont. 1988); *Aetna Casualty and Surety Company v. First Security Bank of Bozeman*, 662 F.Supp. 1126, 1129-30 (D. Mont. 1987); *United Pacific Ins. Co. v. First Interstate Bancsystems of Montana, Inc.,* 690 F.Supp. 917, 918 (D. Mont. 1988).

Here, as in the above-cited cases, the underlying claim for which Chandler argues there was coverage alleged only economic loss. In particular, Chandler's wage loss claim alleged that Scarff had failed to pay him approximately $8,923.52 in wages, and he sought to recover that amount, plus a penalty and interest, as damages. Dkt. 36-3, at 4 & 24. Under Montana law, such purely economic loss does not involve "tangible property," and does not constitute "property damage" within the meaning of the Policy's garage operations coverage provision.

Nor was the economic loss Chandler claims to have suffered "caused by an

'accident'" as required by the Policy's garage operations coverage provision. The Policy defines the term "accident" to include "continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage'." Dkt. 46 (Exh. 500, at 195). The Montana Supreme Court has said that "[f]rom the standpoint of the insured, the term 'accident' reasonably refers to any unexpected happening that occurs without intention or design on the part of the insured." *Blair v. Mid-Continent Casualty Co.*, 167 P.3d 888, 891 (Mont. 2007). As the underlying complaint describes it, Scarff intentionally withheld Chandler's commission payments and refused to pay his wages. Dkt. 36-3, at 4-5. That alleged business decision was not an "accident" as defined by the Policy. *See e.g.*, *Travelers Indmenity Co. of America v. Jim Coleman Automotive of Columbia, LLC*, 236 F.Supp.2d 513, 515-16 (D. Md. 2002) (applying a similar garage operations provision and concluding that "a loss of money by way of fraud or trick, or other purely economic loss resulting from the insured's conduct, without any damage or injury to tangible property, is not an 'accident' or 'property damage' as defined by this and other such policies.")

Because the underlying complaint did not allege "property damage" caused by an "accident," the Policy's garage operations coverage provision does not apply.

## 2.    Employment Practices Endorsement

Chandler next argues that the Policy's Employment Practices Endorsement provides coverage for his underlying constructive discharge claim. The Employment Practices Endorsement extends the coverage otherwise provided for by the Policy, stating as follows:

> We will pay sums an "insured" legally must pay as damages, including punitive damages where insurable by law, because of "bodily injury", "mental anguish" or "mental injury" to which this insurance applies. This insurance applies to "bodily injury," "mental anguish" or "mental injury" only if it is caused by an "act" of "discrimination", "wrongful termination" or "harassment" that results from your employment practices.

> Dkt. 46 (Exh. 500, at 221).

Sentry concedes that the underlying complaint against Scarff alleged "mental injury" as defined by this endorsement. Dkt. 44, at 23. And while Sentry agrees that Chandler "makes a persuasive argument that he was constructively discharged," it appropriately characterizes the issue now before the Court as "whether the allegations that Chandler asserted against Scarff constitute 'wrongful termination' as defined by the Policy." Dkt. 44, at 23.

The Policy defines "wrongful termination" as follows:

> "Wrongful termination" is termination of an employment relationship in a manner which is against the law, or in breach of an implied agreement to continue employment. Wrongful termination does not include damages legally owed under an express contract of employment or an express

obligation to make payments in the event of the termination of employment. Dkt. 46 (Exh. 500, at 224).

Sentry takes the position that this definition explicitly precludes coverage for Chandler's constructive discharge claim because that claim was premised entirely on the damages, or wages, that Chandler alleged Scarff legally owed him under an express contract of employment.  In May 2007, Chandler and Scarff did in fact enter into an express contract setting forth the terms of Chandler's base salary and commissions.  Dkt. 36-1, at 2.   The underlying complaint alleged in substance that Scarff failed to pay the wages due Chandler under their express contract, thereby causing Chandler's constructive discharge.  Dkt. 36-3, at 7-11. As Sentry thus reads it, the Policy's employment practices endorsement does not cover Chandler's claim because "wrongful termination does not include damages legally owed under an express contract of employment."  Dkt. 46 (Exh. 500, at 224).

Even assuming otherwise, and accepting for purposes of this discussion only that Chandler's constructive discharge claim could initially be said to fall within the scope of the employment practices endorsement, coverage would nevertheless be precluded under the Policy's exclusionary language.   The Policy states, in relevant part, that the additional insurance provided by the employment

practices endorsement does not apply to:

> Any dishonest, malicious, fraudulent, criminal or intentional "act";
> however, this exclusion does not apply to you if such "act" was committed
> by your "employees" (other than a partner, director, or executive officer)
> without your direction or your knowledge.

> Dkt. 46 (Exh. 500, at 222).

This intentional conduct exclusion clearly bars coverage for Chandler's constructive discharge claim as pled in the underlying complaint. Chandler repeatedly alleged that Scarff deliberately refused to pay the commission payments due him. For example, Chandler accused Scarff's owners and executive officers of "refusing to pay" his commissions and "attempting to force" him into working for less than minimum wage. Dkt. 36-3, at 8. Chandler claimed that Scarff's owners and executive officers "made the choice to not" pay him his commission wages, and acted "with actual malice" in forcing his constructive discharge. Dkt. 36-3, at 8-9. Chandler premised his entire lawsuit, including his constructive discharge claim, on the notion that Scarff deliberately refused to pay him, thereby causing his constructive discharge. Because Chandler's constructive discharge claim alleged only intentional conduct, the employment practices endorsement's intentional conduct exclusion precludes coverage.

In an attempt to show otherwise on summary judgment, Chandler retreats

from his earlier allegations of intentional conduct. Chandler now maintains that Scarff "did not act willfully in not paying [him,] Scarff just could not pay [because] it was insolvent...." Dkt. 34, at 26. Regardless of its reasons, Scarff deliberately chose to withhold Chandler's commission wages. There is nothing in the record indicating that Scarff somehow inadvertently or accidentally failed to pay Chandler. To the contrary, the evidence of record establishes that the decision was a deliberate one. For example, Scarff advised its employees in October 2009 that it was discontinuing its practice of paying monthly commissions, and later explained that it reduced Chandler's wages because of financial concerns. Dkt. 36-1, at 3-4. Because it is evident on the present record that the acts giving rise to Chandler's constructive discharge claim were intentional, the employment practices endorsement's intentional acts exclusion precludes coverage.

### 3. Personal and Advertising Injury Liability Coverage

Finally, Chandler contends that his so-called "False Light" claim against Scarff is covered by the Policy's Broadened Garage Coverage Endorsement. That endorsement contains the following Personal and Advertising Injury Liability Coverage provision:

> We will pay all sums the "insured" legally must pay as damages, including punitive damages where insurable by law, because of "personal and advertising injury" caused by an offense arising out of your business, but

only if the offense was committed in the Coverage Territory and during the
Policy Period.

Dkt. 46 (Exh. 500, at 209).

The Policy defines a "personal or advertising injury" as "arising out of one
or more of" a specific list of ten offenses.  Dkt. 46 (Exh. 500, at 214).  According
to Chandler, the underlying complaint alleged a "personal and advertising injury"
arising out of the fourth listed offense – "Oral or written publication, in any
manner, of material that slanders or libels a person or organization or disparages a
person's or organization's goods, products, or services."  Dkt. 46 (Exh. 500, at
214.  Specifically, Chandler maintains that his "False Light" claim against Scarff
was actually one for defamation, and is therefore covered under this endorsement.

Chandler's "False Light" claim alleged that Scarff "publicized [his]
previous employment at [Scarff] by telling persons '[Chandler] terminated early as
he did not show up or phone in for his scheduled shift on 10/15/2009."  Dkt. 36-3,
at 16.  Chandler accused Scarff of acting with "reckless disregard in providing
false statements to the public," and putting him in the position of having "to
defend himself to the Montana Unemployment Division (in regard to receiving
unemployment benefits)."  Dkt. 36-3, at 16.

Even assuming that Chandler's allegations could be interpreted as asserting

a personal or advertising injury as contemplated by the Policy, coverage would be barred under the exclusion for injuries arising out of employment related practices. The Policy states that the insurance it provides does not apply to personal and advertising injury to a person arising out of "[t]ermination of that person's employment" or "[e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person." Dkt. 46 (Exh. 500, at 210, 212). Chandler's claim that his former employer defamed him following his constructive discharge, and in doing so interfered with his attempt to recover unemployment benefits, falls squarely within this exclusion.

For all of the reasons discussed above, Chandler has not met his summary judgment burden of demonstrating that he is entitled to judgment as a matter of law on the question of coverage.

## C. UTPA Claim

Chandler next argues he is entitled to judgment as a matter of law on his claim that Sentry misrepresented pertinent facts and insurance policy provisions in violation of Mont. Code Ann. § 33-18-201(1). In particular, he moves for summary judgment on his claim that Sentry's adjuster, Joel Ponedel, misled him regarding the Policy's liability limits "when he represented that he was out of

defense costs."[4]  Dkt. 34, at 40.

The undisputed evidence of record reflects that Chandler and Ponedel engaged in relatively lengthy settlement negotiations as Chandler's underlying lawsuit against Scarff proceeded.  Dkt. 36-1, at 8-9; 49-1, at 1-5; 46 (Exh. 501, at 188-267).  Ponedel consistently advised Chandler that Sentry evaluated his claim as having defense value only.  *See e.g.* Dkt. 46 (Exh. 501, at 198 & 200).  As their negotiations continued and the amount of Sentry's offer increased to $11,000, Ponedel also advised Chandler that he believed he was "out of the range of defense cost at this level." Dkt. 36-1, at 8.  When Sentry increased its offer to the $12,000 for which the case ultimately settled, Ponedel again advised Chandler that he had "to draw a line in the sand somewhere and [was] already out of defense cost value." Dkt. 36-1, at 9.

Chandler maintains that Ponedel's statements regarding defense costs

_____

[4] Chandler also argues for the first time in his reply brief that this Court should grant him summary judgment on his claim that Sentry refused to pay his claim without conducting a reasonable investigation based upon all available information in violation of Mont. Code Ann. § 33-18-201(4).  Dkt. 50, at 3.  But because Chandler did not move for summary judgment on this basis or otherwise address the issue in his supporting brief, that claim is not properly before Court on the present motion and the Court declines to address the issue here. *See e.g. Lincoln General Ins. Co. v. Access Claims Administrators, Inc.*, 596 F. Supp. 2d 1351, 1372 n.10 (E.D. Cal. 2008) (citing *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 846 (9th Cir. 1976)) (explaining that "[i]t is not proper for the court to consider new arguments raised in a reply" brief).

misrepresented the Policy's $500,000 per occurrence liability limit and $1,500,000 aggregate liability limit.  As Chandler notes, the Policy states  that Sentry's "duty to defend or settle ends when the applicable Liability Coverage Limit of Insurance – "Garage Operations" – Other Than Covered "Autos" has been exhausted by payment of judgment or settlements."  Dkt. 46 (Exh. 500 at 165).  Chandler apparently believes that this provision somehow obligated Sentry to continue negotiating with him until the Policy's liability limits were exhausted.  Chandler is mistaken.  The parties to the underlying action were free to settle their dispute for any amount, no matter how small.   That is what happened here.  Chandler agreed to settle his claims against Scarff for $12,000.  Once Sentry paid that settlement, its duty to defend Scarff under the Policy ended.

Chandler also argues that Ponedel's statements as to how the amount over which they were negotiating was "out of the range of defense cost" or "out of defense cost value" misrepresented the fact that the Policy's liability limits were far higher.  Chandler is mistaken.  He points to no statements by Ponedel about the about the Policy's liability limits, or about those liability limits being exhausted.  Ponedel was simply explaining that he believed the amount over which they were negotiating exceeded the defense value of the case.   Because Chandler has not shown that Ponedel in any way misrepresented the pertinent facts or Policy

provisions during the course of those negotiations, he is not entitled to summary judgment.

## III.   Motion in Limine

Chandler moves in limine to preclude Sentry from introducing evidence Scarff is insolvent and no longer doing business in Montana.  Chandler argues that evidence of Scarff's insolvency is irrelevant, and that any probative value such evidence might have would be outweighed by its prejudicial effect.

As Sentry notes in response to Chandler's motion, however, this case is still in its initial stages.  Discovery does not close until March 15, 2012, and trial is set for June 18, 2012.   Because the parties are free to engage in discovery for several more months, it would be premature to rule on Chandler's motion at this juncture. Because the issues Chandler raises are better addressed in the context of the upcoming trial, his motion in limine is denied as premature.  Chandler may renew his motion at the close of discovery and before the April 16, 2012, motions deadline, or raise these evidentiary issues before the presiding judge at the time of trial.

## IV.   Conclusion

For all of the above reasons,

IT IS RECOMMENDED that Plaintiff's Motion for Partial Summary

Judgment be DENIED.   Furthermore,

IT IS ORDERED that Plaintiff's Motion in Limine is DENIED, subject to renewal.

DATED this 22nd day of September, 2011

 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge